

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 24, 2024**

_____
United States Bankruptcy Judge

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JRjr33, Inc. | § | Case No. 18-32123-SGJ-7 |
| | § | |
| Debtor. | § | Chapter 7 |
| | § | |
| ROBERT YAQUINTO, In His Capacity as Chapter 7 Trustee of Jrjr33, Inc. | § § § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 23-03086-SGJ |
| | § | |
| CNA INSURANCE COMPANIES dba CONTINENTAL CASUALTY COMPANY | § § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING RULE 12(c) MOTION

1

I. **INTRODUCTION**

Before this court is an insurance coverage dispute. The dispute found its way to the bankruptcy court in a convoluted manner. There are two different debtors, in separate cases before the same bankruptcy judge, and each debtor has a connection to this coverage dispute.

<u>The JR Debtor.</u> One debtor is JRjr33, Inc. ("JR"), Case No. 18-32123, which is in a long-running Chapter 7 case. JR's case was originally filed as a Chapter 11 case and was converted to a Chapter 7 case a few months later. Its trustee is Robert Yaquinto, who is the plaintiff herein ("Plaintiff"). JR owned numerous subsidiaries that sold home goods and personal products, apparently mostly in a multi-level marketing structure, including (i) one called The Longaberger Company (which sold iconic, wooden picnic baskets, and also filed bankruptcy along with JR), and (ii) another called Agel Enterprises, Inc. ("Agel"), which sold nutritional supplements and skin care products (and did not file bankruptcy).

<u>The ActiTech Debtor.</u> The other debtor is ActiTech, L.P. ("ActiTech"), Case No. 22-30049. ActiTech was a manufacturer of nutraceuticals and skin care products with a large manufacturing facility north of Dallas. ActiTech's case was filed as a Chapter 11 a few years after the JR case, and it confirmed a plan on October 5, 2022. Thus, it is now a reorganized debtor.

<u>The Usury Suit.</u> How are JR and ActiTech intertwined? They and certain of their affiliates did business together in the days before they each filed bankruptcy.[1] ActiTech, as a manufacturer, was a supplier of product to Agel. ActiTech extended credit terms (i.e., a floating line of credit

---

[1] A pleading filed in the JR case, of which this court takes judicial notice, indicates that an individual named Michael Bishop was a board member of JR and was also an insider and/or owner of ActiTech at the time of the events that are at issue in this coverage dispute. Case # 18-32123, DE # 258, ¶ 12. The court takes judicial notice that Michael Bishop's ex-wife, Ellysiann Bishop, was president of ActiTech at the time of its bankruptcy filing and throughout its Chapter 11 case.

2

with a complex formula) to Agel for the purchase of product. Eventually the two got crossways, with Agel accusing ActiTech of charging it usurious interest (allegedly in excess of 28%, in violation of the Texas usury statute).  Tex. Fin. Code Section 305.003.  A lawsuit was filed on November 3, 2017, against ActiTech and its affiliates, styled *JRjr33, Inc. and Agel Enterprises, Inc. v. Michael Bishop et al.,* Cause No. DC-17-15206, in the 116th Judicial District Court of Dallas County, Texas (the "Usury Suit").  Therein, Agel sought an approximately $11 million **statutory civil penalty** from ActiTech and its affiliates for three times the amount of the allegedly usurious interest **charged**.  Agel did not seek monetary damages for the alleged usury beyond the penalty. To be clear, Agel did not allege that ActiTech had actually **received** the unlawful interest, but that ActiTech was nevertheless liable because Texas Finance Code § 305.001(a-1) imposes usury liability on anyone who "contracts for or receives" interest greater than the amount authorized.

Meanwhile, during the pendency of this state court Usury Suit, each JR and ActiTech filed their respective bankruptcy cases.  First, JR did in year 2018.  Shortly thereafter, Plaintiff (who held ownership and control of Agel) was granted standing on behalf of Agel to pursue the Usury Suit.  Then, ActiTech filed its Chapter 11 in 2022, and removed the Usury Suit to the bankruptcy court, Adv. Proc. # 22-3002.  The court notes anecdotally that ActiTech filed a proof of claim in the JR case and Agel filed a proof of claim in the ActiTech case.[2]

The Usury Settlement.  Eventually, on July 20, 2022, Agel (through Plaintiff) and ActiTech reached a settlement (after multiple attempts at mediation) pursuant to which ActiTech agreed to pay JR and Agel $2,750,000 in damages and ***also assigned to JR all rights, interest, and claims it***

---

[2] On October 22, 2018, ActiTech filed Proof of Claim No. 30 in the JR bankruptcy case, asserting a claim of $1,767,359.93 for amounts purportedly owed for products manufactured. On March 21, 2022, Agel filed Proof of Claim No. 16 in the ActiTech bankruptcy, asserting a claim of $16,279,744.42 relating to the alleged usury, plus prejudgment interest and attorneys' fees on its usury claim.

3

*might have against ActiTech's insurer* under a directors and officers liability policy on which ActiTech was an insured (the "Usury Settlement"). The bankruptcy court approved the Usury Settlement in both the JR and ActiTech bankruptcy cases in October 2022. Case # 18-32123, DE #262 (entered 10/12/22). Case # 22-30049, DE #127 (entered 10/7/22; considered at the same time as plan confirmation).[3]

      <u>The Now-Pending Coverage Dispute</u>. This brings us to the current Adversary Proceeding, filed October 22, 2023. Plaintiff brought this action as assignee of ActiTech, subsequent to the Usury Settlement. The defendant named herein is CNA Insurance Companies dba Continental Casualty Company ("Continental"). Continental provided the directors and officers liability insurance policy to ActiTech, under policy no. 425594086 (the "Policy"), issued to Actiprime, Inc. ("Actiprime")[4] for the period July 24, 2017 to July 24, 2018. See Compl. ¶3; Policy, Ex. A. The Policy provides directors and officers liability coverage with a $1 million aggregate limit of liability. See Policy, Ex. A.

      Plaintiff has alleged in this Adversary Proceeding that Continental breached the Policy by not paying for a covered loss (Compl. ¶28); breached an "implied covenant of good faith and fair dealing" by failing to accept a settlement demand or make a reasonable settlement offer, and by denying coverage and/or not tendering a full defense (Compl. ¶29); violated the Texas Insurance Code by engaging in certain unfair settlement practices (Compl. ¶¶35-36); engaged in common law bad faith by failing to make or accept a settlement offer (Compl. ¶43); and violated the Texas

---

[3] The court is not aware whether the insurer, Continental, was provided notice of the Usury Settlement in either the JR case or the ActiTech case. Moreover, the Policy does not appear to be in the record from the hearings on the Usury Settlement. The court merely points this out to rule out any specter of estoppel being applicable here (the court has not previously ruled on the issue of whether assignment of the Policy was legally permissible).

[4] Actiprime was apparently an affiliate of ActiTech but, in any event, there is no dispute that ActiTech was an insured under the Policy. The court notes that ActiTech is named on the "Additional Insured Endorsement" attached to a copy of the Policy submitted to the court.

4

Deceptive Trade Practices Act by making unspecified misrepresentations and failing to disclose unspecified information (Compl. ¶48). Plaintiff also seeks declaratory relief that the Policy is valid, that the Policy covered the usury claim, and that Continental violated the Policy and state law by not providing coverage and attempting to settle the claim. According to Plaintiff, sometime in the middle of year 2021, a "Stowers demand" was sent to Continental, offering to settle within the existing Policy limits, but Continental did not respond.

While this Adversary Proceeding was originally pleaded more broadly, it appears that Plaintiff has now narrowed its arguments to these: Continental is liable for breach of contract for failure to cover the usury claim as a covered "Loss," and Plaintiff also has a Stowers claim against Continental related thereto. Plaintiff alleges that it is entitled to recover the $2.75 million paid by ActiTech to settle the claim and the attorneys' fees paid by ActiTech for its defense. See Compl. ¶¶31 40, 45, 49.[5]

In a Rule 12(c) Motion of Continental that is now before the court, Continental argues that Plaintiffs' claims in this Adversary Proceeding fail as a matter of law because the Policy does not provide coverage for a ***civil penalty*** claim, such as was asserted against ActiTech pursuant to the Texas usury statute. Specifically, civil penalty claims are excluded from the Policy's definition of "Loss." Thus, the Policy was inapplicable, and Continental had no duty to defend or indemnify ActiTech. Continental further argues that, because all of Plaintiff's claims in the Adversary Proceeding are premised upon the existence of coverage for the underlying usury claim, they must all be dismissed. Further to that point, Continental adds that Plaintiff's alternative request (in his Response to the Rule 12(c) Motion) to amend his complaint to assert or clarify a "Stowers claim"

---

[5] To be clear, Plaintiff has now agreed that his claims for violation of DTPA and the Texas Insurance Code, his claim for declaratory relief, and his claims for breach of a common law implied covenant of good faith and fair dealing should be dismissed.

5

should be denied as futile (the Stowers doctrine requires a covered claim to begin with, so the proposed claim would not survive the lack of a covered "Loss"). Finally, Continental argues that the Policy's "Anti-Assignment provision" prohibited an assignment of rights under the terms of the Policy without Continental's written consent (adding that the Policy, whose coverage period had expired prepetition, was not an executory contract, under section 365, that might have been assumed and assigned by the debtor ActiTech).

This court agrees with Continental on all points. The court's reasoning is more fully set forth below. The Rule 12(c) Motion will be granted.

## II.  LEGAL STANDARD

When reviewing a motion for judgment on the pleadings, the court may only consider the pleadings, documents incorporated into the pleadings by reference and matters of which the court may take judicial notice. *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.,* 976 F.3d 585 (5th Cir. 2020). The standard for Rule 12(c) motions for judgment on the pleadings is identical to the standard for Rule 12(b)(6) motions to dismiss for failure to state a claim. *Waller v. Hanlon,* 922 F.3d 590, 599 (5th Cir. 2019). In evaluating a motion to dismiss under Rule 12(b)(6), a complaint is to be charitably construed, with all well pleaded factual allegations being accepted as true, and with any reasonable inferences from those facts being drawn in favor of the non-moving party. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–556 & 569 n. 14 (2007). Moreover, "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555–556.

In 2009, the Supreme Court clarified the *Twombly* pleading standard and elaborated that, to survive a motion to dismiss, a civil complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129

S.Ct. 1937, 173 L. Ed. 2d 868 (2009) (the Court also affirmed the *Twombly* two-pronged approach to deciding motions to dismiss: first, determine what is a factual allegation versus a legal conclusion, as only factual allegations will be accepted as true; and second, determine whether the factual allegations state a plausible claim for relief).

### III. ANALYSIS

Analysis of the Rule 12(c) Motion essentially boils down to the following two issues: (a) first, whether the Policy excluded civil penalty claims from its definition of "Loss"; (b) second, assuming that civil penalty claims did constitute a covered "Loss," whether the Policy was an executory contract that could be assumed and assigned, without the written consent of Continental pursuant to section 365 of the Bankruptcy Code ("the Code"), despite the Policy's "Anti-Assignment provision".

The court concludes that the Policy excludes civil penalty claims, such as the one asserted in the Usury Suit, from its definition of "Loss"; therefore, the Policy did not apply to the claim in the underlying Usury Suit, and Continental had no duty to defend or indemnify ActiTech. The court further concludes that, even if the claim was covered as a "Loss," the Policy was not an executory contract of ActiTech that could have been assumed and assigned, pursuant section 365(f), notwithstanding the Policy's "Anti-Assignment provision".

#### A. *Loss*

First, the court concludes that the civil penalty claim in the Usury Suit is not a covered loss under the Policy, because the Policy's definition of "Loss" explicitly excludes civil penalties. The Policy defines "Loss" as including "punitive and exemplary damages." See Policy, Ex. A. However, the Policy explicitly states that "Loss" does not include "***civil or criminal fines, penalties, taxes, sanctions, or forfeitures imposed on an Insured whether pursuant to law,***

7

*statute, regulation, or court rule*…" *Id.* (Emphasis added.) As a reminder, the Usury Suit sought only a statutory civil penalty from ActiTech and its affiliates for three times the amount of the allegedly usurious interest charged. It did not seek monetary damages for the alleged usury beyond the penalty. This is a permissible way to proceed under the Texas Finance Code § 305.001(a-1).

The Plaintiff directs the court to the Fifth Circuit's decision in *Flagship Credit Corp. v. Indian Harbor Insurance Co.*, 481 F. App'x 907 (5th Cir. 2012).[6] to defend its position. Plaintiff argues that *Flagship* concerned an insurance policy with identical language, and there the Fifth Circuit held that the "penalties" excluded by the loss provision included only penalties payable to the government.

The insurance policy in *Flagship* was, in fact, not identical to the Policy here. It was merely similar. It stated that "loss [would] not include… fines, penalties, or taxes imposed by law." *Id.* at 909. The Fifth Circuit determined that canons of construction must be applied to the word "penalties" before any other analysis, because the term was ambiguous. *Id.* at 911. The court applied the *noscitur a scoiis* canon of construction[7] to determine the meaning of the word "penalties". The court determined that fines and taxes described payments that could only be made to the government. Therefore, within the limited context of the insurance policy there, the court held that the meaning of penalties meant only penalties payable to the government—as "penalties" needed to fit with the meaning of the other words in the group. *Id.*

The court is not persuaded that *Flagship* is dispositive because, as noted, the language at issue there differed from the Policy's language here in two critical ways. First, the Policy here, unlike

---

[6] The court in *Flagship* stated that "Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4." However, this court will address the case as the parties referenced it heavily.

[7] Stating that a word may be known by the company it keeps. *Russell Motor Car Co. v. United States,* 261 U.S. 514, 519, 43 S. Ct. 428, 67 L. Ed 778 (1923)

in *Flagship*, includes a "civil or criminal" preamble that operates to expand the concept of penalties. See Policy, Ex. A, p. CAN-000048. Second, the Policy states that a Loss does not include "fines, penalties, taxes, sanctions or forfeitures," while the Flagship policy did not include "sanctions" or "forfeitures" in its list of exclusions. *Id.; Flagship,* 481 F. App'x at 909.

Here, because the meaning of the word penalty in the loss exclusion clause is not ambiguous, the court does not need to apply canons of construction. The Policy explicitly states that the definition of "Loss" does not include "***civil*** or criminal…penalties" (emphasis added) while the *Flagship* policy merely excluded 'penalties' without reference to whether the penalties were ***civil*** or criminal. Here, the "civil or criminal" preamble serves to clarify the intended extent of the enumerated items. It would be an absurd result to find that the definition of "Loss" in the Policy included a claim for a civil penalty that might be imposed in favor of a private party, when the plain language explicitly excludes it. Moreover, the court is unconvinced by the Plaintiff's argument that the relief sought in the Usury Suit was not a civil penalty, when the Plaintiff explicitly sought "civil penalties" in its original claim. See Ninth Am. Pet., Ex. B.

Even if the meaning of the word penalty here was ambiguous, applying the *noscitur a sociis* canon would not lead to the same conclusion that the *Flagship* court reached. To construe a word within the meaning of a larger group, there must be a majority that governs. In *Flagship*, the court determined that two of the three words (fines and taxes) were payable only to the government, so it followed that penalties would have the same meaning. Here, only two of the five words are exclusively payable to the government. Again, the Policy excludes from "Loss": "fines, penalties, taxes, sanctions and forfeitures." See Policy, Ex. A, p. CAN-000048. While fines and taxes may be payable only to the government, sanctions and forfeitures can be paid to private individuals. No

9

majority exists to govern the meaning of all terms, so applying the *noscitur a sociis* canon of construction here does not result in finding that penalties are only payable to the government.

For the foregoing reasons, the Policy does not cover the Usury Suit because the Policy explicitly excluded civil penalties from the definition of "Loss".

### B. *The Policy is Not an Executory Contract*

ActiTech assigned to JR "any and all causes of action [ActiTech] might have against [Continental]…" in the Usury Settlement. Final Settlement Agreement and Mutual Release at 6-7. First and foremost, no cause of action against Continental exists because the underlying civil penalties claim in the Usury Suit was not a covered loss.

However, even if the Policy covered the claimed loss, the Policy and rights therein were not assignable without Continental's written consent, pursuant to the terms of the Policy. Moreover, the Policy was not an executory contract. Thus, section 365(f)—which sometimes operates to over-ride an anti-assignment clause in an executory contract—does not apply.

The Policy's "Anti-Assignment provision" states that "Assignment of interest under this Policy shall not bind the Insurer unless its consent is endorsed to this Policy," and here, Continental did not consent by an endorsement. See Policy, Ex. A, p. CNA-000035. Courts will generally uphold anti-assignment provisions so long as they do not interfere with the operation of a statute. *Nautilus Ins. Co. v. Concierge Care Nursing Centers, Inc.,* 804 F. Supp. 2d 557, 560 (S.D. Tex. 2011).

Here, the relevant statute is argued to be section 365 of the Code, governing executory contracts. The Code permits a trustee to assign an executory contract of a debtor to a third party even if the contract features an anti-assignment provision. *See* 11 U.S.C. § 365(f); *Matter of Provider Meds, LLC*, 907 F.3d 845, 851 (5th Cir. 2018). While Congress has not defined the phrase

10

executory contract, courts generally employ the so-called Countryman definition of executory contracts, which states that a contract is executory when the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure to complete performance would be a material breach excusing performance of the other. *In re Placid Oil Co.,* 72 B.R. 135, 137 (Bankr. N.D. Tex. 1987). Here, the Plaintiff argues that the contract was executory at the time of the filing of the ActiTech bankruptcy case (in 2022), even though the coverage period (July 2017-July 2018) had ended, because both parties still had material obligations left to fulfill. The court finds this argument unpersuasive.

Plaintiff cites *Charter School Solutions v. GuideOne Mutual Insurance Company* 407 F. Supp 3d 641 (W.D. Tex. 2019), to support the proposition that an insurance contract whose coverage period has ended can still be executory. The court in *Charter Schools* stated that a material obligation on the part of an insured could include such things as compliance with a prompt notice provision or co-operation clause. *Id.* at 648. However, the *Charter Schools* decision goes against the majority of the case law. This court does not find the reasoning persuasive. The court in *Charter Schools* acknowledges that courts are split regarding whether an expired or terminated insurance policy is executory.

The court in *Charter Schools* cites to two cases to support the proposition that some courts recognize expired insurance contracts as executory, both of which are distinguishable from this case. In one of these cases, *In re Fort Worth Osteopathic Hospital Inc.,* 387 B.R. 706, 714 n.14 (Bankr. N.D. Tex. 2008), the court discussed the issue only in a footnote, and there stated that there are arguments on either side of the issue but ultimately declined to rule either way. In the other case, *In re Texscan Corp.,* 976 F.2d 1269, 1273 (9th Cir. 1992), the insured was still obligated to pay for the final five weeks of coverage under the insurance contract, and the policy was still

active at the time the debtor filed its petition. This case is distinguishable from the one at hand as here, the insurance policy period was no longer ongoing when the debtor filed its petition, and the debtor had made all of its premium payments.

The majority of courts have found that no material obligation remains if the insured has paid all premiums, and the policy period is no longer in effect because the contract was terminated or expired. *In re Fed.-Mogul Glob. Inc.*, 385 B.R. 560 (Bankr. D. Del. 2008); *In re Placid Oil Co.*, 72 B.R. 135, 137 (Bankr. N.D. Tex. 1987); *In re Fed. Press Co. Inc.*, 104 B. R. 56, 66 (Bankr. N.D. Ind. 1989). In *In re Federal Press Company Inc.,* the court stated the insurance contract at issue had expired and was not executory. *Id.* at 66. There, the court concluded that the executory contract period ended when the last effective date for the policy passed. *Id.*

Here, the Policy period expired July 24, 2018, over three years before ActiTech filed bankruptcy. When ActiTech assigned its claim to Plaintiff, the policy period had been expired for almost four years. The contract was not executory because the effective period of the Policy had expired, and the premiums were already paid. Therefore, no material obligation remained on the part of ActiTech or other insureds. The lingering duty of the Plaintiff to provide notice to the insurer and co-operate is an obligation, the breach of which may lead to damages, but it is not a *material* obligation that would lead to a finding that the contract is executory.

### IV. Conclusion

Accordingly, for the reasons set forth above, the Rule 12(c) Motion is granted as the Plaintiff has failed to state a claim upon which relief can be granted in this Adversary Proceeding. The underlying civil penalty claim asserted in the Usury Suit was not a covered Loss pursuant to the Policy. Even if the claim had been a covered Loss, the Policy and rights therein were unassignable, absent Continental's written consent, and Continental did not provide written consent to assignment of the Policy and rights thereunder to the Plaintiff. Finally, the Policy was not an executory contract under section 365 of the Code, that might have been assumed and assigned by the insured to the Plaintiff absent Continental's consent, pursuant to section 365(f).

Based on the foregoing,

**IT IS ORDERED** that the Motion of Defendant for Judgment on the Pleadings is **GRANTED.** Continental shall submit a Judgment consistent herewith.

###END OF MEMORANDUM OPINION AND ORDER###